PENSACOLA STATE BANK v. THORNBERRY et al.

(Circuit Court of Appeals, Sixth Circuit.    October 5, 1915.)

No. 2628.

1. JUDGMENT ⊛489—VALIDITY—JURISDICTION.

Defendants, residents of Kentucky, executed and delivered a note to the cashier of the plaintiff, Florida bank, which he agreed to discount with another bank. After representing to defendants that the note had been destroyed, he pledged it as collateral to another bank, and, after taking it up, delivered it to the bank of which he was an officer as security for his indebtedness there. Subsequently the cashier's defaults were discovered, and suit was instituted against defendants in Kentucky; the note being filed there. The plaintiff bank was nonsuited as to that note, and thereafter instituted suit against the cashier in the Eastern district of Illinois. The note was not in the district, although the prayer of the suit was that plaintiff be declared to have its cashier's title to the instrument. Defendants were served with citation to appear and set up their title. Judicial Code (Act March 3, 1911, c. 231) § 57, 36 Stat. 1102 (Comp. St. 1913, § 1039), declares that, in any suit commenced in any Circuit Court to enforce any lien upon personal property within the district, an order directing any absent nonresident defendant to appear and make defense may be served upon him wherever found, and in default of appearance the court may entertain jurisdiction and proceed to an adjudication, which, as regards such absent defendant, shall affect only the property which shall have been the subject of the suit and under the jurisdiction of the court within the district. *Held* that, as to defendants who did not appear, the decree in the Illinois district was a nullity, and subject to collateral attack.

[Ed. Note.—For other cases, see Judgment, Cent. Dig. §§ 924, 925; Dec. Dig. ⊛489.]

2. SUBROGATION ⊛11—RIGHT TO SUBROGATION.

In such case, though the cashier paid his debt to the bank, with which he pledged the note, with funds of the plaintiff, and later transferred the

note to plaintiff bank to secure his indebtedness to that institution, plaintiff was not subrogated to the rights of the creditor bank, for it was not obliged to pay its cashier's debt, and if the payment had been intentional, the right of subrogation would not be enforced against the equity of a third person.

[Ed. Note.—For other cases, see Subrogation, Cent. Dig. § 4; Dec. Dig. ☜11.]

3. TRUSTS ☜102—RESULTING TRUSTS.

In such case, as the cashier had no rights in the note, plaintiff cannot assert an equitable lien upon it on the theory of a resulting trust, notwithstanding the usual rule that, where an agent uses the funds of his principal, a resulting trust arises in equity, giving the principal an equitable lien.

[Ed. Note.—For other cases, see Trusts, Cent. Dig. § 153; Dec. Dig. ☜102.]

4. ACTION ☜23—ACTION AT LAW—ENFORCEMENT OF EQUITABLE RIGHTS.

In an action at law on a note, equitable rights, such as subrogation, and equitable liens, cannot be enforced.

[Ed. Note.—For other cases, see Action, Cent. Dig. §§ 146–152; Dec. Dig. ☜23.]

5. BANKS AND BANKING ☜116—KNOWLEDGE OF CASHIER—NOTICE TO BANK.

Where a bank cashier, who received a note for discount with another institution, the proceeds to be used to buy land for the makers, fraudulently represented to them that he had destroyed it, and then pledged it to secure his own debt, his own bank, from which he appropriated funds to pay his debt, cannot assert equitable rights in the note, being charged with the agent's knowledge.

[Ed. Note.—For other cases, see Banks and Banking, Cent. Dig. §§ 282–287; Dec. Dig. ☜116.]

6. BILLS AND NOTES ☜333—ACTIONS—"HOLDER IN DUE COURSE."

Semble, under Ky. St. § 3720b, subsecs. 52, 190, declaring that a "holder in due course" is one who has taken an instrument complete and regular on its face, before maturity, without notice of dishonor, and in good faith and for value, and that a holder means the payee or indorsee of a bill, who is in possession of it, or the bearer, a bank from which its cashier took funds to discharge his debt to another institution cannot be held a holder in due course of a note fraudulently pledged by the cashier as collateral for his debt.

[Ed. Note.—For other cases, see Bills and Notes, Cent. Dig. §§ 806–811; Dec. Dig. ☜333.

For other definitions, see Words and Phrases, First and Second Series, Holder in Due Course.]

7. LIMITATION OF ACTIONS ☜25—ACTIONS ON NOTES—"NEGOTIABLE PROMISSORY NOTE."

Notwithstanding the implied repeal of Ky. St. § 483, placing negotiable notes on the footing of bills of exchange, by Negotiable Instruments Act, § 3720b, which, in subsection 184, declares that every unconditional promise in writing to pay on demand, or at a fixed or determinable future time, a sum certain in money to order or bearer, is a "negotiable promissory note," action upon an instrument of that character, when negotiated before maturity, is barred by the five-year limitation prescribed by section 2515, declaring that an action upon a bill of exchange or a promissory note placed upon the footing of a bill of exchange shall be commenced within five years after accrual.

[Ed. Note.—For other cases, see Limitation of Actions, Cent. Dig. § 120; Dec. Dig. ☜25.

For other definitions, see Words and Phrases, First and Second Series, Negotiable Note.]

☜For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

**8.** LIMITATION OF ACTIONS ☞104½, New, vol. 6 Key-No. Series—TOLLING OF
STATUTE—NONSUIT.

While Ky. St. § 2544, provides that, in all cases where the doing of an
act necessary to save any right or benefit is restrained or suspended by
injunction or other lawful restraint, such time shall not be estimated in
the application of any statute of limitations, the institution by plaintiff
of an action on a note, which at the mere suggestion of the court that
it could not be maintained at law was voluntarily dismissed, does not
operate to toll the statute.

**9.** JUDGMENT ☞617—BAR—DEFENSES—CONSTRUCTION.

Where a decree in a suit on a note, to which one of the defendants was
a party, merely adjudicated that plaintiff was a holder in due course, and
specifically provided that defendants could make other defenses, such de-
fendant may rely on the statute of limitations.

[Ed. Note.—For other cases, see Judgment, Cent. Dig. §§ 1062, 1130,
1131; Dec. Dig. ☞617.]

**10.** TRIAL ☞48—RECEPTION OF EVIDENCE.

In an action on a note, where only one of the defendants was precluded
from urging want of consideration, evidence of want of consideration was
properly received.

[Ed. Note.—For other cases, see Trial, Cent. Dig. § 120; Dec. Dig. ☞
48.]

In Error to the District Court of the United States for the West-
ern District of Kentucky; Walter Evans, Judge.

Action by the Pensacola State Bank against J. E. Thornberry and
others. There was a judgment for defendants, and plaintiff brings
error. Affirmed.

J. B. Baskin, of Louisville, Ky., for plaintiff in error.

W. T. Ellis, of Owensboro, Ky., for defendants in error.

Before WARRINGTON and KNAPPEN, Circuit Judges, and
SANFORD, District Judge.

SANFORD, District Judge. This is an action at law brought by
the Pensacola State Bank, formerly styled the Pensacola Bank & Trust
Company, a Florida corporation, the plaintiff in error, against J. E.
Thornberry and others, the defendants in error, citizens and residents
of Kentucky, upon a promissory note for $5,000. The trial resulted
in a verdict and judgment in favor of the defendants; and the plain-
tiff has brought this writ of error.

The essential facts, shown by the undisputed evidence, are these:

On April 23, 1906, the defendants, at Sebree, Kentucky, executed
and delivered to one C. J. Scudamore, who was then cashier of the
Pensacola Bank, a promissory note for $5,000, negotiable and payable
at the First National Bank of Sebree, on or before May 15, 1907.
This note, together with a similar note for $5,467.50, was executed
and delivered by the defendants to Scudamore for the sole purpose of
being discounted at a bank in Nashville, Tennessee, and realizing for
the defendants money with which to buy a tract of land in Florida,
which he had called to their attention, and was not to be used by him
for any other purpose. It was executed and delivered to him with the

name of the payee left blank, with the understanding that this blank was to be filled in by the bank discounting the note.

On April 26, 1906, Scudamore borrowed $10,000 for his own individual use from the American National Bank of Nashville, and, having filled in his own name as payee of this note, endorsed and delivered it to the American Bank as collateral security for his individual loan, without the knowledge or consent of the defendants. A few days later he notified the defendants that he had been unable to discount the note and had destroyed it; and they had no notice that he had pledged it to the American Bank until in 1908, long after its maturity, and never ratified or approved the pledge in any manner. He did not use any part of the money borrowed from the American Bank for the purchase of the Florida land; and the defendants received no consideration whatever for the note. At some time, not shown by the proof, but claimed by the plaintiff to have been before the pledge to the American Bank, he also affixed the name of one C. H. Ramsey as a maker of the note, without the knowledge or consent of said Ramsey or of the defendants.

On May 6, 1907, shortly before the maturity of the note, Scudamore paid the American Bank $5,000 on his loan and renewed the remainder; this payment being made by drawing his own check for $5,000 on the Pensacola Bank, in which he then had only a small deposit insufficient to meet the check. The American Bank accepted this check in part payment of his loan, and in consideration thereof released and delivered to him the note of the defendants which it held as collateral. It entered this check on its books as a charge against the Pensacola Bank, which then had a balance with it of less than $5,000, and on the same day wrote the Pensacola Bank, notifying it of this charge and inclosing Scudamore's check. This letter was, however, received by Scudamore, as cashier of the Pensacola Bank, and concealed by him, although he acknowledged its receipt to the American Bank. He destroyed his own check and did not charge it against himself on the books of the Pensacola Bank, and subsequently, on receiving a reconcilement from the American Bank showing an overdraft against the Pensacola Bank, concealed the real situation by false entries on the books of the Pensacola Bank; the other officers of the Pensacola Bank knowing nothing of these transactions until some time in 1908, when Scudamore's fraudulent conduct was discovered. It is not shown, however, that the Pensacola Bank at any time thereafter questioned the correctness of the charge made against it by the American Bank by reason of Scudamore's check, or ever denied its liability therefor as between it and the American Bank.

After re-obtaining possession of the note from the American Bank, Scudamore, at a time not precisely shown, changed its due date from May 15, 1907, to May 15, 1908, without the knowledge or consent of the defendants, who believed that it had been destroyed; and thereafter, on November 2, 1907, after its maturity and after the change in the due date and the addition of the name of E. H. Ramsey, pledged it to the Pensacola Bank as security for a loan of $6,000 made to him at the time.

In 1908, Scudamore's derelictions having been in the meantime discovered, the Pensacola Bank brought an action at law against the defendants, in the court below, upon this note and the other note for $5,467.50. Upon the trial of that suit the plaintiff having, at the conclusion of the evidence, avowed, in answer to an inquiry from the trial judge, that it relied upon the title to the $5,000 note acquired by reason of its payment of Scudamore's check to the American Bank in May, 1907, the trial judge suggested that in his opinion the plaintiff had not thereby shown a legal title to this note, but that any right it might have acquired by reason of this transaction was a merely equitable title, which probably could only be enforced by a suit in equity to which Scudamore might be a party, but that if the plaintiff desired it might dismiss the suit as to this note without prejudice; which action was accordingly taken by the plaintiff; the suit thereupon proceeding as to the $5,467.50 note and resulting in a verdict and judgment in favor of the plaintiff, which was subsequently affirmed by this court. Melton v. Pensacola Bank (6th Circ.) 190 Fed. 126, 111 C. C. A. 166.

In January, 1911, the Pensacola Bank filed a bill in the United States Circuit Court for the Eastern District of Illinois, against Scudamore, who was then confined in the Hospital for the Insane within said district, and the defendants herein, setting forth the use of its funds by Scudamore on May 6, 1907, in the payment to the American Bank, and the consequent surrender of the $5,000 note to him, and praying that it be substituted and subrogated, as of that date, to the title and ownership of the note under the pledge to the American Bank, and decreed to have an equitable lien thereto as security for the amount paid the American Bank with its funds. The note, however, was not exhibited with the bill, and was not then in the Illinois district, having previously been delivered by Scudamore to the Pensacola Bank and filed by it in the suit in Kentucky in the court below, where it then was. Service of process under this bill was made upon Scudamore, who appeared and answered by guardian ad litem; and an order was entered requiring the absent defendants to appear and make defense by a day stated, which was served on them in Kentucky. The defendant Pike thereupon entered a special appearance and moved the court to set aside this order for substituted service and to quash its service; which motion was, on motion of the complainant, stricken from the files. Thereupon he filed a demurrer to the bill, which was overruled; after which he filed an answer. The other defendants not having appeared and made defense, a decree pro confesso was entered against them. And at a subsequent hearing on the pleadings and proof, the court entered a final decree adjudging the Pensacola Bank to be the owner and holder of the note, in due course, as of May 6, 1907, as security for the payment of $5,000, with interest from said date; quieting its title and ownership thereto as against the defendants; and enjoining them from asserting any right, title or interest therein, but not otherwise precluding them from making any legal defense against their liability as makers thereof in the event they should thereafter be sued thereon. No appeal was taken from this decree.

Subsequently, on May 24, 1912, more than five years after the maturity of the note, the plaintiff instituted the present suit in the court below. The petition described the note as of its original due date, and alleged that on May 6, 1907, the plaintiff became, and still was, the owner and holder thereof, in due course, as security for the payment of $5,000, with interest, such title and ownership having been acquired as shown by the final decree in the Illinois suit, which was set forth in extenso; and by an amended petition a transcript of the entire record in the Illinois suit was filed as an exhibit. The answers denied that the plaintiff had become the owner and holder in due course, or at all, of the note, as security; denied that such title and ownership was acquired by the Illinois decree; averred 'that the Illinois court was without jurisdiction of the defendants and that its decree was void; relied as defenses upon want of consideration and the alterations in the note as to the due date and signature of C. H. Ramsey; plead the Kentucky statute of limitations of five years; and also relied on other defenses.

It inferentially appears from the record that the plaintiff rested its case in the court below, primarily, at least, if not entirely, upon the supposed conclusive effect of the Illinois decree as an adjudication that the plaintiff was a holder of the note in due course as of May 6, 1907. The learned trial Judge, however, charged the jury that the title to the note passed to the plaintiff for the purposes of the suit by the transfer and delivery to it by Scudamore on November 2, 1907; that the Illinois decree at most confirmed the plaintiff's title thereto as to any claim Scudamore might have had, but was otherwise void against the defendants and of no effect so far as their defenses were concerned; and that if they found, either that the change in the due date of the note was made after its maturity, May 15, 1907, or that the note was made without consideration, their verdict should be for the defendants. The plaintiff excepted to these portions of the charge; but neither requested the court to submit the case to the jury on the theory that it had, independently of the Illinois decree, acquired title to the note by virtue of the transaction of May 6, 1907, nor moved for a directed verdict in its own favor. There was no reference in the charge to the defense of the statute of limitations; nor any request submitted by the defendants in reference thereto.

The jury returned a verdict that, after deciding that the note was changed after May 15, 1907, they found for the defendants.

The plaintiff's assignments of error relate solely to the charge of the court and the admission of evidence.

The plaintiff now concedes that if its title to the note depends upon the pledge of November 2, 1907, made after its maturity, the verdict and judgment below were correct, by reason of the want of consideration for the note; but earnestly insists that it should have been allowed to rely upon its title to the note derived as of May 6, 1907; that it is conclusively adjudged by the Illinois decree to be the holder of the note, in due course, as of that date, before maturity; that this further appears, independently of this Illinois decree, from the undisputed evidence in the case; that being the holder in due course before

maturity the defense of want of consideration is cut off and the change of the due date after its right to the note had accrued does not preclude it from recovering thereon according to its original tenor; and that it was therefore, on the undisputed evidence, entitled to a verdict and judgment in its favor, and the judgment in favor of the defendants should accordingly be reversed and a new trial granted.

We assume, for present purposes, that the plaintiff's exceptions to the charge and its assignments of error sufficiently raise, by implication at least, the questions upon which it now relies, so as to authorize the granting of a new trial if it should appear that the plaintiff was either entitled to a verdict and judgment below on the undisputed evidence, or to a submission of the case to the jury with reference to the effect of the transaction of May 7, 1907; and, on the other hand, we think it clear, that if, on the undisputed evidence, the defendants were entitled to a verdict and judgment in their favor, so that no prejudicial error resulted to the plaintiff from the course taken in the trial below and a new trial would be a merely futile proceeding, the judgment below should be affirmed.

Our conclusions are:

[1] 1. The Illinois decree is void as to all the defendants herein except T. J. Pike, who appeared and made defense thereto upon the merits. The service of the appearance order upon the defendants outside of the district clearly conferred no jurisdiction over them unless the suit came within the provisions of section 8 of the Act of March 3, 1875, c. 137, 18 Stat. 472 (subsequently embodied in section 57 of the Judicial Code), in which it was provided that in any suit commenced in any Circuit Court "to enforce any * * * lien upon or claim to * * * real or personal property within the district where such suit is brought," an order directing any absent nonresident defendant to appear and make defense, might be served on him, wherever found, and that, in default of his appearance, the court might entertain jurisdiction and proceed to an adjudication of the suit, which should, however, as regards such absent defendant, "affect only the property which shall have been the subject of the suit and under the jurisdiction of the court therein, within such district." However, both when this suit was commenced and the appearance order was served on the defendants, the note, which was the subject of the suit, was not in the Illinois district. And we are of opinion that it cannot be deemed to have been constructively within that district upon the theory that its situs followed Scudamore, as the legal holder; especially as he had previously pledged the note to the plaintiff, which was then its legal holder so far as he was concerned, so that its legal situs, upon this theory, would have been in the State of Florida. Accordingly, as neither its physical nor legal situs was in the Illinois district, the note cannot be deemed to have been within that district, within the meaning of the Act of 1875, either when the suit was commenced or the appearance order was served on the defendants. And we are therefore of opinion that the Illinois court, by the proceedings in the suit, did not acquire jurisdiction over any of the present defendants other than Pike; and, further, that as **to such defendants its decree is consequently void** for want of jurisdic-

tion, and clearly subject to collateral attack upon that ground. Thompson v. Whitman, 18 Wall. 457, 469, 21 L. Ed. 897; Windsor v. McVeigh, 93 U. S. 274, 283, 23 L. Ed. 914; Simmons v. Saul, 138 U. S. 439, 452, 11 Sup. Ct. 369, 34 L. Ed. 1054; Scott v. McNeal, 154 U. S. 34, 46, 14 Sup. Ct. 1108, 38 L. Ed. 896; Butterfield v. Miller (6th Circ.) 195 Fed. 200, 203, 115 C. C. A. 152; Audas v. Highland Land Co. (6th Circ.) 205 Fed. 862, 864, 125 C. C. A. 62.

[2] 2. The plaintiff did not become the holder of the note in due course by reason of the transaction of May 6, 1907. We may assume for present purposes that this transaction amounted, as the plaintiff in effect insists, to the unauthorized use by Scudamore of its funds in paying $5,000 of his debt to the American Bank, thereby taking down the collateral note, and not to a mere overdraft by Scudamore, subsequently ratified by the plaintiff in its course of dealings with the American Bank and amounting in effect to a mere loan to Scudamore. However, treating the transaction as an unauthorized use by Scudamore of the plaintiff's funds, it is clear, in the first place, that the plaintiff did not thereby become subrogated to the original rights of the American Bank as pledgee of the note in due course. The plaintiff occupied no relation to Scudamore's debt to the American Bank, as surety or otherwise, which would have compelled it to pay this debt to preserve its own rights; hence, even an intentional payment of this debt would not have entitled it to subrogation to the rights of the American Bank. Ætna Ins. Co. v. Middleport, 124 U. S. 534, 548, 8 Sup. Ct. 625, 31 L. Ed. 537. Neither is the plaintiff entitled to subrogation to the rights of the American Bank as holder of the note in due course against the makers, on the theory of an implied agreement by Scudamore that upon the use of its funds in paying his debt, it should be subrogated to the rights of the American Bank as against him. Subrogation is a purely equitable right, and will not be enforced as against the equity of third persons or decreed when it will work injustice to them. Budd v. Olver, 148 Pa. 194, 198, 23 Atl. 1105; Union Trust Co. v. Monticello Ry., 63 N. Y. 311, 314, 20 Am. Rep. 541; Orvis v. Newell, 17 Conn. 97, 101. Thus even by an express agreement with the debtor, subrogation will only be enforced in equity when the agreement creates equitable rights against the debtor which do not impair or overthrow the equitable rights of innocent third persons. Browder v. Hill (6th Circ.) 136 Fed. 821, 824, 69 C. C. A. 499. The instant case, in this respect, is essentially different from Buist v. Williams, 88 S. C. 252, 279, 70 S. E. 817, in which it was held that where a trustee wrongfully used trust funds in discharging a mortgage on his own property, the cestui que trust would be subrogated to the lien of the mortgage thus removed from his property; there being in that case no intervening rights of innocent third persons.

[3] Neither did the use by Scudamore of the plaintiff's funds create an equitable lien upon the note when released from the pledge to the American Bank, upon the theory that a resulting trust in the note was thereby created in the plaintiff's favor. The general rule that if an agent or trustee uses the funds of his principal or cestui que trust

to purchase property in his own name, a resulting trust arises in equity, giving the principal or cestui que trust an equitable lien upon such property as against the wrongdoer to secure the money thus wrongfully used, has no application to the instant case. It may well be that such resulting trust will also arise where the wrongdoer instead of purchasing property for himself uses the money of another for the purpose of discharging his own property from a mortgage or other incumbrance, and that upon the discharge of the wrongdoer's property from such incumbrance the person whose money had been thus wrongfully used, acquires an equitable lien thereon to secure the repayment of the money thus used. It is, however, apparent, that, under this doctrine, the resulting trust, which arises by implication of law, is created only against the wrongdoer and extends only to his interest in the property wrongfully purchased or released from a prior incumbrance, and that it cannot operate to create an equitable lien on property released from a prior incumbrance in which the wrongdoer has in fact no interest to which such resulting trust can attach. Thus if Scudamore had been the owner of the note when he pledged it to the American Bank, and had subsequently released it from such pledge by the use of the plaintiff's funds, a resulting trust would apparently have arisen as against Scudamore which would have subjected the note upon its release from the prior pledge to an equitable lien in favor of the plaintiff. In the present case, however, Scudamore in fact had no title or property interest in the note, either when he pledged it to the American Bank or when it was released from such pledge, but merely held it in his possession as agent of the defendants to be used for certain specified purposes. We are therefore clearly of the opinion that as Scudamore had in fact no title to or interest in the note, there was nothing to which a resulting trust in favor of the plaintiff could attach upon its release from the prior pledge, and that hence no equitable lien was created in favor of the plaintiff by the unauthorized use of its funds in releasing it from such pledge. The doctrine of a resulting trust, which is purely one of equity, should clearly not be enforced so as to do injustice to innocent third persons, especially by creating a fictitious property interest in the wrongdoer to which the equitable lien resulting through his misconduct may attach, to the prejudice of third persons. We therefore conclude that the plaintiff did not become the holder of the note in due course by virtue of the May transaction, either upon the theory of subrogation to the rights of the American Bank as pledgee, or upon that of an implied lien created by a resulting trust against Scudamore; and, in short, that the plaintiff did not in consequence of this transaction acquire any title whatever to the note or interest therein or become the holder thereof in any manner or for any purpose.

[4] And even if this transaction had been such as to either entitle the plaintiff to subrogation in equity to the right of the American Bank as a holder in due course or to create in its behalf an equitable lien upon the note by virtue of a resulting trust against Scudamore, neither such subrogation nor equitable lien could properly have been declared or enforced in the court below, in the present action at law;

the declaration and enforcement of either of such rights being solely matters of equitable cognizance.

[5] Furthermore, even if the use of plaintiff's funds by Scudamore in releasing the note from the prior pledge, would otherwise have created, by implication, an equitable lien upon the note, as one previously good in the hands of the prior holder, nevertheless, as such lien could have to be worked out through Scudamore and in consequence of his action, we think the rule laid down in Ditty v. Dominion Bank (6th Circ.) 75 Fed. 769, 771, 22 C. C. A. 376, and Skud v. Tillinghast (6th Circ.) 195 Fed. 1, 7, 115 C. C. A. 83, that a principal receiving property through the agency of another cannot retain it without assuming the burden of the agent's knowledge as to how it came to be obtained, would be applicable, at least by analogy, so as to charge the plaintiff, in acquiring such lien, with Scudamore's knowledge of the want of consideration for the note, as well as of the alteration in the names of the makers; so that for this reason also, it could not be deemed to have acquired the note as a holder in due course before maturity without notice of its infirmities.

[6] And we may add that we furthermore strongly incline to the view that, under the definitions of a "holder in due course" and a "holder," as given in sections 52 and 190 of the Kentucky Negotiable Instruments Act (Ky. Stats. § 3720b, subsecs. 52 and 190), a person is not to be deemed a holder of a note in due course unless it has been "negotiated" and transferred to him, by either endorsement or delivery, and that one to whom the note has not been so negotiated and transferred and who merely claims an equitable interest therein resulting, in invitum, in consequence of the wrongful act of another in which he did not participate, cannot, under the Act, be properly deemed, in any event, a holder in due course, so as to take the note free from defects under section 57 of the Act.

[7] 3. The present suit, not having been commenced until more than five years after the due date of the note, was barred by the Kentucky statute of limitations. Section 2515 of the Kentucky Statutes, which has been in force many years, provides that "an action upon a bill of exchange, * * * or upon a promissory note, placed upon the footing of a bill of exchange, * * * shall be commenced within five years * * * after the cause of action accrued." By section 483 of the Kentucky Statutes promissory notes payable and negotiable at any bank in Kentucky, and endorsed to and negotiated by any bank in Kentucky, were in terms "placed on the same footing as bills of exchange." This section was, however, repealed by implication by the Kentucky Negotiable Instruments Act, approved March 24, 1904. Williams v. Paintsville Bank, 143 Ky. 781, 784, 137 S. W. 535, Ann. Cas. 1912D, 350; Southern Bank v. Schimpler, 159 Ky. 372, 375, 167 S. W. 148. However, long prior to the passage of this Negotiable Instrument Act it was held by the Court of Appeals of Kentucky, in a suit brought in Kentucky upon a note executed and payable in Ohio, that since the Ohio statute, which fixed the character of the note, made all promissory notes for a sum certain payable to any person, order or assigns, "negotiable" by endorsement, and all such notes pay-

able to a person or bearer, "negotiable" by delivery, this statute placed such notes upon the footing of a bill of exchange, and hence not subject in the hands of an innocent holder to a set-off which existed in favor of the payor against antecedent parties. Stevens v. Gregg, 89 Ky. 461, 464, 12 S. W. 775 (1889). And, after the passage of the Negotiable Instruments Act, in another suit brought in Kentucky upon a similar Ohio note, it was held, upon the express authority of Stevens v. Gregg, supra, that this Ohio statute placed the note "on the footing of a bill of exchange," and that hence, when sued on in Kentucky, it was barred by the statute of limitations of five years contained in section 2515 of the Kentucky Statutes. German Bank v. Zimmer, 141 Ky. 401, 402, 132 S. W. 1023 (1911). The substance of these holdings is that a statute which makes a note "negotiable" by endorsement or delivery, ipso facto places it on the same footing as a bill of exchange; and hence governed, when sued on in Kentucky, by the five year statute of limitations. By section 184 of the Negotiable Instruments Act, however, every unconditional promise in writing signed by the maker engaging to pay on demand or at a fixed or determinable future time, a sum certain in money, to order or to bearer, was declared to be a "negotiable promissory note." Kentucky Statutes, § 3720b, subsec. 184. Under the doctrine of Stevens v. Gregg and German Bank v. Zimmer, therefore, it necessarily and logically results that such notes, when negotiated before maturity, are by force of the Act, placed on the footing of a bill of exchange, and hence governed as to the bringing of suit by the five year statute. And this is the view recently expressed by the Court of Appeals of Kentucky in Southern Bank v. Schimpler, 160 Ky. 813, 814, in which, on a petition for rehearing, modifying the opinion previously expressed on the original hearing in Southern Bank v. Schimpler, 159 Ky. 372, 167 S. W. 148, the court said, obiter, that the five year limitation of section 2515 was applicable when the note had been negotiated before maturity and "thereby placed upon the footing of bills of exchange" and was in the hands of a third party, but that so long as it remained in the hands of the original payee and had not been assigned or transferred to a third person, it was not upon the footing of a bill of exchange, but was controlled by the fifteen year statute of limitation as to the principals and the seven year statute as to sureties.

It results, therefore, that even if the plaintiff could be held a holder of the note in due course before maturity, its suit upon the note thus in its hands, would be barred by the statute of limitations, not having been commenced within five years after its maturity.

[8] Furthermore, the case is not taken out of the operation of the statute of limitations by reason of the plaintiff's dismissal of its former suit upon this note without prejudice. Section 2544 of the Kentucky Statutes provides that in all cases where the doing of an act necessary to save any right or benefit "is restrained or suspended by injunction or other lawful restraint" the time covered by the injunction or restraint "shall not be estimated in the application of any statute of limitations." While the former suit was dismissed at the suggestion of the trial judge, after his intimation that the action could

apparently not be maintained at law, it was nevertheless a voluntary act on the part of the plaintiff. There was no order of the court requiring such dismissal, and no action on the part of the defendants which led to such course being taken by the plaintiff. Even if the trial judge was in error in such intimation, a matter not determined, the plaintiff's remedy was clearly to proceed in the suit and in the event of a dismissal by the trial judge obtain a review of the judgment of dismissal under writ of error to this court. The course of action taken by the plaintiff, however, in acquiescing in this intimation and voluntarily dismissing the suit clearly involved no judicial inhibition or legal impediment which operated as a lawful restraint upon it. The case is therefore clearly distinguishable from Knight v. Illinois Cent. Rd., 143 Ky. 418, 421, 136 S. W. 874, in which the trial court, on objection interposed by the defendant, had refused to allow the plaintiff to dismiss his first suit without prejudice and directed a verdict in favor of the defendant, and this action of the trial court having subsequently been reversed in appellate proceedings and the plaintiff having thereupon forthwith dismissed his first suit without prejudice and immediately brought another suit, it was held that the action of the trial court in the first suit, which remained effective until reversed by the appellate court, operated as a legal impediment, procured by the defendant, which had prevented the plaintiff from instituting another suit during the time that the judgment of the trial court was in force, and that hence the time during which such restraint was operative should be excluded in the application of the statute of limitations to the second suit. We think it clear, however, that, upon the undisputed facts, no lawful restraint is shown in regard to the former suit which brings the present case within this exception to the statute of limitations. Furthermore it does not appear from the record that the plaintiff in the present suit filed any reply to the defendant's pleas of the statute of limitations setting up the alleged unlawful restraint now in question, or in any manner invoked the action of the trial court in regard thereto.

[9] 4. The defendant Pike, by appearing generally and pleading to the merits in the Illinois case, after his motion to dismiss and quash the service of process had been overruled, submitted himself to the jurisdiction of the court, so that the decree subsequently rendered against him and not appealed from, is now conclusive upon him. However, as this decree merely adjudicated that the plaintiff was the holder of the note in due course as of May 6, 1907, and specifically provided that the defendants should not be prevented from making other defenses to the note in the event they should be sued as makers, it obviously does not now prevent the defendant Pike from relying upon the defense of the statute of limitations in the present suit; and it is expressly conceded in the plaintiff's brief that this defense is not foreclosed by the Illinois decree.

5. We therefore conclude that, upon the undisputed facts, the plaintiff was not entitled to a verdict or judgment against any of the defendants, such facts showing a complete defense in favor of all the defendants except Pike, both upon the merits of the controversy and

by reason of the statute of limitations, and in favor of the defendant Pike by reason of the statute of limitations.

[10] 6. We furthermore find no error in the action of the trial court in overruling the plaintiff's objections to certain portions of the testimony relating to the want of consideration for the note; this being a material issue in the case upon which all the defendants except Pike were entitled to rely.

7. Finding, therefore, that, upon the undisputed facts, the plaintiff was not entitled to a verdict or judgment against any of the defendants, and that, on the contrary, upon such facts they were entitled to a verdict and judgment in their favor, and that the record hence discloses no prejudicial error as against the plaintiff, the judgment below will be affirmed, with costs.